Per Curiam.
*218 {¶ 1} Respondent, Harlan Daniel Karp, of Cleveland, Ohio, Attorney Registration No. 0042411, was admitted to the practice of law in Ohio in 1989.
{¶ 2} In a May 4, 2017 certified complaint, relator, disciplinary counsel, alleged that Karp violated ten professional-conduct rules by neglecting a client's immigration matter, failing to reasonably communicate with that client, and failing to maintain client funds separate from his own property. The parties submitted stipulations of fact, misconduct, and aggravating and mitigating factors and recommended that Karp be suspended from the practice of law for two years, with the entire suspension stayed on two conditions.
{¶ 3} Based on the parties' stipulations of fact and misconduct, the hearing testimony, and stipulated exhibits, a panel of the Board of Professional Conduct found that Karp committed eight of the ten alleged violations. After considering the relevant aggravating and mitigating factors *821 and the sanction imposed for comparable misconduct, the panel rejected the parties' stipulated sanction and instead recommended that Karp be suspended from the practice of law for two years, with 18 months stayed on conditions. The board adopted the panel's report and recommendation.
{¶ 4} Karp objects to the board's recommended sanction and argues that the mitigating factors present in this case warrant the imposition of a two-year suspension, with the entire suspension stayed on conditions. For the reasons that follow, we agree with the board's findings of fact and misconduct, overrule Karp's objection, and suspend Karp from the practice of law for two years, with 18 months stayed on the conditions that he (1) enter into a contract with the Ohio Lawyers Assistance Program ("OLAP"), comply with all treatment recommendations of OLAP and his treating healthcare professionals, and provide relator with quarterly reports demonstrating that compliance and (2) commit no further misconduct.
*219 Misconduct
Count One: The Veronika Gadzheva Matter
{¶ 5} The parties stipulated and the board found that in 2015, a New Jersey dance studio filed an I-129 Petition for Non-Immigrant Worker seeking an O-1B visa[1] on behalf of Veronika Gadzheva, a Bulgarian ballroom dancer. The United States Citizen and Immigration Services ("USCIS") granted the petition, and Gadzheva entered the United States on May 11, 2015, with an O-1B visa that expired on February 27, 2018. Soon thereafter, Gadzheva obtained an offer of employment from Patricia West, the owner of a dance studio in California.
{¶ 6} On July 22, 2015, Gadzheva e-mailed Karp about transferring her O-1B visa to West's studio. Karp accepted the case and informed Gadzheva that his fee would be $750 plus a $325 filing fee. Karp told Gadzheva that she could move to California and begin working at West's studio once a new I-129 petition had been filed. Karp also explained that because the petition had to be filed by West and that West would need to sign some forms, the filing "could take a week." By July 31, 2015, Gadzheva had e-mailed Karp approximately 500 pages of documents regarding her existing visa and wired $325 to his client trust account for the filing fee. On August 17, 2015, Karp e-mailed West and requested that she answer a few details pertaining to her studio and her anticipated employment relationship with Gadzheva. In this e-mail, Karp stated that he would e-mail West the completed I-129 for her signature before filing it. West responded on August 24, 2015.
{¶ 7} On September 10, 2015, Gadzheva e-mailed Karp asking whether he had filed the I-129. Karp falsely responded, "Yes. Sent." Several weeks later, Gadzheva wired $750 as payment in full for her legal fees. In early October, Gadzheva informed Karp that she was leaving for California and that she had hoped the petition would be approved soon. Although Karp had not yet filed the petition, he falsely stated, "It [confirmation of approval] should arrive this week. I will email it to you." On October 20, 2015, Gadzheva's former employer requested that the I-129 petition that it had filed on her behalf be revoked. Karp was unaware of that request and the subsequent revocation of the petition until several months later.
*822 {¶ 8} In early November, after receiving an e-mail from Gadzheva inquiring into the status of the petition, Karp responded, "Still pending. Give it another week or two." In the meantime, Karp continued to lead Gadzheva into believing that he had filed the I-129 petition by answering her questions about what she could and could not do while she was waiting for approval. On December 3, 2015, *220 Gadzheva e-mailed Karp and asked whether she could take a trip back to Europe "when the papers still aren't ready is this gonna be a problem for my status." Karp replied, "No. Your visa (on your passport) is still good."
{¶ 9} From December 2015 to April 2016, Gadzheva and West made numerous requests for proof that the petition had been filed. But Karp consistently misrepresented the status of the case by telling them that the petition had been filed and that it should be approved shortly. Once, he instructed West not to contact USCIS directly, claiming that such contact would cause further delay. And when Gadzheva inquired about restarting the entire process, Karp told her to be patient.
{¶ 10} On April 14, 2016, West demanded that Karp provide the receipt number for Gadzheva's petition. Karp filed the petition with USCIS the next day-more than seven months after he first claimed that he had done so-along with a notice of his representation. Karp had signed West's name in two places on the petition and once on the notice of representation. One of the signatures on the petition was under a disclaimer that stated, "I certify under penalty of perjury, that I have reviewed this petition and that all of the information contained in the petition * * * is complete, true, and correct." Although Karp has stipulated that West never gave him authority to sign her name or implied that he had the authority to do so, he nonetheless believed that he had the authority to sign West's name because she and Gadzheva consistently requested proof of a filed I-129, which could not be filed without West's signature.
{¶ 11} On April 25, 2016, Karp e-mailed West the receipt number for Gadzheva's petition. The next day, Karp and West received an I-797E form (Notice of Action) from USCIS. The I-797E form is commonly referred to as a request for additional evidence ("RFE"). The RFE not only asked for additional information regarding Gadzheva's classification status, but also informed Karp that at the request of Gadzheva's former employer, her original petition had been revoked. Without conferring with West or Gadzheva, Karp responded to the notice and indicated that while he sought classification for Gadzheva's extraordinary ability in the arts (an O-1B classification), he had no objection to a classification for her extraordinary ability in athletics (an O-1A classification).
{¶ 12} On May 2, 2016, in response to a request from West, Karp e-mailed her a complete copy of his file. After providing West the file, Karp believed that his representation had ended-even though there is no evidence that either Gadzheva or West communicated such an intention or that Karp ever informed USCIS that he no longer represented Gadzheva. After Karp failed to respond to a second RFE from USCIS, the petition that he had filed on behalf of Gadzheva was deemed abandoned, and denied.
*221 {¶ 13} Gadzheva retained new counsel, and on July 11, 2016, a new I-129 petition was filed on her behalf. USCIS granted her a new O-1B visa. However, because Gadzheva's original I-129 petition had been revoked, her immigration status was not valid when she filed the July 11, 2016 petition. Therefore, Gadzheva has to leave the United States in order to activate her new O-1B status. But Gadzheva is *823 afraid to leave the country because the revocation of her original petition may have caused her to begin accruing days of "unlawful presence" in the United States, which could result in her being banned from the United States for three-to-ten years. Accordingly, the board found that Karp's neglect and ongoing misrepresentations to his client could have extremely serious consequences for her.
{¶ 14} Gadzheva filed a grievance against Karp in July 2016. In response to relator's first letter of inquiry, Karp enclosed an unsigned copy of the I-129 petition that he claimed to have filed on behalf of Gadzheva. Karp also falsely stated that West had authorized him to file the I-129 petition. Subsequently, because a signature from West was necessary in order to file the petition, relator sent Karp a letter requesting additional information. Specifically, relator asked whether Karp had signed West's name on the form, and if so, whether he had indicated that he signed it with authority or whether he made it appear as if West had signed the form. Karp responded, "I signed Ms. West's name on the form and noted I had authority. I had received information to fill out the form from her (attached). A copy of the signed version is attached. Exhibit C." Although Karp claimed that Exhibit C was a copy of the petition that he had filed with USCIS, it was not. Exhibit C indicated that he had signed West's name "per authority," but the petition that was filed with USCIS did not have the "per authority" notation-it just had West's purported signature.
{¶ 15} The board found that Karp's conduct violated Prof.Cond.R. 1.3 (requiring a lawyer to act with reasonable diligence in representing a client), 1.4(a)(1) (requiring a lawyer to inform the client of any decision or circumstance with respect to which the client's informed consent is required), 1.4(b)[2] (requiring a lawyer to explain a matter to the extent reasonably necessary to permit the client to make an informed decision), 1.4(a)(2) (requiring a lawyer to reasonably consult with the client about the means by which the client's objectives are to be accomplished), 8.1(a)[3] (prohibiting a lawyer from knowingly making a false *222 statement of material fact in connection with a disciplinary matter), and 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). Consistent with the parties' stipulations, an additional alleged violation was dismissed based on insufficiency of the evidence.
Count Two: Karp's Client Trust Account
{¶ 16} From at least June 1, 2015, until at least May 31, 2016, Karp had been using his client trust account to pay personal and business expenses even though he maintained and used an operating account during that time. During that same period of time, he had also been depositing earned fees into-and allowing earned fees to accumulate in-his client trust account beyond the amount necessary to cover bank and credit-card processing fees. Karp explained that because he was a solo practitioner without a bookkeeper or office assistant, it was easier to pay bills from one account than to take the extra step of *824 transferring earned funds from his client trust account to his operating account or personal accounts. Despite Karp's commingling of funds and improper use of his client trust account, there was no evidence that any client funds were misappropriated. And upon learning of relator's investigation into his client-trust-account practices, Karp ceased using that account to pay personal or business obligations.
{¶ 17} The parties stipulated and the board found that this conduct violated Prof.Cond.R. 1.15(a) (requiring a lawyer to hold the property of clients in an interest-bearing client trust account, separate from the lawyer's own property) and 1.15(b) (prohibiting a lawyer from depositing his own funds in a client trust account except to pay or obtain a waiver of bank service charges). Additionally, the stipulation that Karp had violated Prof.Cond.R. 1.15(c) was rejected and that violation was dismissed due to insufficient evidence.
Recommended Sanction
{¶ 18} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.
{¶ 19} As aggravating factors, the parties stipulated and the board found that Karp committed multiple offenses and caused harm to Gadzheva, whose immigration status rendered her extremely vulnerable. See Gov.Bar R. V(13)(B)(4) and (8). In addition, the board found that Karp acted with a dishonest motive, exhibited a pattern of misconduct that was reflected in his repeated misrepresentations, *223 and engaged in deceptive practices during the disciplinary process. See Gov.Bar R. V(13)(B)(2), (3), and (6).
{¶ 20} The board adopted stipulated mitigating factors that included the absence of prior discipline, Karp's timely, good-faith effort to make restitution and rectify the consequences of his misconduct, and evidence of his good character and reputation. See Gov.Bar R. V(13)(C)(1), (3), and (5). Dr. Sherif Soliman, a board-certified psychiatrist, testified that Karp suffers from hypothyroidism and major depressive disorder and that those conditions contributed to his misconduct. He reported that Karp has complied with a regimen of prescribed medication that has given him more energy, improved his sleep and concentration, and reduced his feelings of depression. He also opined that he did not find "a psychiatric contraindication to Mr. Karp continuing to practice law." On those facts, the board found that Karp's mental disorder qualified as a mitigating factor. See Gov.Bar R. V(13)(C)(7).
{¶ 21} The parties jointly recommended that Karp be suspended from the practice of law for two years, with the entire suspension stayed on the conditions that he enter into a contract with the OLAP, that he comply with all treatment recommendations of OLAP or his treating healthcare professionals, and that he provide relator with quarterly reports demonstrating that compliance.
{¶ 22} We have held that conduct involving fraud, deceit, dishonesty, or misrepresentation usually requires an actual suspension from the practice of law for an appropriate period of time. Disciplinary Counsel v. Fowerbaugh , 74 Ohio St.3d 187, 190-191, 658 N.E.2d 237 (1995). And while we have acknowledged that "an abundance of mitigating evidence can justify a lesser sanction," Disciplinary Counsel v. Markijohn , 99 Ohio St.3d 489, 2003-Ohio-4129, 794 N.E.2d 24, ¶ 8, we have also found that an actual suspension from the practice of law is particularly appropriate when an attorney has made deliberately false statements to a client, *825 Disciplinary Counsel v. King , 74 Ohio St.3d 612, 614, 660 N.E.2d 1160 (1996) (citing the reprehensible nature of dishonesty directed toward a client to justify the imposition of a six-month suspension on an attorney who repeatedly assured a client that he had refiled the client's claim even though he had not done so).
{¶ 23} Despite the presence of four mitigating factors and Karp's acknowledgment of his wrongdoing, the board remained troubled by his failure to appreciate the gravity of his misconduct-which included a pattern of misrepresentations to Gadzheva, West, the federal government, and relator-and the very serious consequences that his misconduct may have on Gadzheva and her immigration status. The board considered two cases in which we imposed partially stayed term suspensions on attorneys who made false representations to their clients in an effort to conceal additional attorney misconduct.
*224 {¶ 24} In Disciplinary Counsel v. Keller , 110 Ohio St.3d 240, 2006-Ohio-4354, 852 N.E.2d 1195, ¶ 3-5, 14, an attorney neglected a client's personal-injury matter, falsely represented that a lawsuit had been filed on the client's behalf and that he had received a settlement offer, and failed to inform the client that he did not carry professional-liability insurance. Aggravating factors, including the attorney's dishonesty, the client's vulnerability, and the resulting harm to the client, were outweighed by the mitigating factors, which included the absence of prior discipline, the attorney's genuine remorse, evidence of his good character, a qualifying chemical dependency, total compliance with an OLAP contract, a significant period of sobriety, and a series of unfortunate events in the attorney's personal life. Id. at ¶ 9-10. Nevertheless, we determined that the attorney's attempts to conceal his neglect and his failure to remedy the harm that he caused warranted an actual suspension from the practice of law. Id. at ¶ 13. We therefore suspended him from the practice of law for two years, with 18 months of the suspension stayed on conditions. Id. at ¶ 14.
{¶ 25} And in Disciplinary Counsel v. Riek , 125 Ohio St.3d 46, 2010-Ohio-1556, 925 N.E.2d 980, an attorney misappropriated client funds, issued a settlement check to a client when his client trust account contained insufficient funds to honor the check, and lied to his client about why the check had been dishonored. There were no aggravating factors. Mitigating factors included the absence of prior discipline, full and free disclosure to the board and having a cooperative attitude toward the disciplinary proceeding, and positive character evidence. Although the client was not ultimately harmed by the attorney's conduct, we found that the attorney's deception warranted the imposition of an 18-month suspension, with 12 months stayed on conditions.
{¶ 26} Finding Keller and Riek to be instructive, the board recommended that we suspend Karp for two years, with 18 months of the suspension stayed on the conditions recommended by the parties, with additional requirements that he engage in no further misconduct, pay the costs of these proceedings, and serve a two-year period of monitored probation upon his reinstatement to the practice of law.
Karp's Objection to the Recommended Sanction
{¶ 27} Karp objects to the board's recommended sanction and argues that a fully stayed suspension is appropriate in this case for two reasons. First, he argues that the board did not accord sufficient weight to his mitigating evidence. And second, he contends that the board failed to consider two cases in which we imposed *826 fully stayed suspensions for comparable misconduct: Toledo Bar Assn. v. Crosser , 147 Ohio St.3d 499, 2016-Ohio-8257, 67 N.E.3d 789 ; and Disciplinary Counsel v. Fumich , 116 Ohio St.3d 257, 2007-Ohio-6040, 878 N.E.2d 6. *225 {¶ 28} After a thorough review of the record, we find that the facts surrounding several of the mitigating factors advanced by Karp limit their mitigating effect. For example, Gov.Bar R. V(13)(C)(3) provides that when considering whether to recommend a lesser sanction, the board may consider "[a] timely, good faith effort to make restitution or to rectify the consequences of misconduct." Here, the board credited Karp for making restitution to Gadzheva and attempting to rectify the consequences of his misconduct. However, Karp waited approximately eight months after he claims that Gadzheva had terminated his representation to issue a refund (and he made the payment only at relator's request). And while Karp paid $1,225 from his personal accounts to expedite the processing of Gadzheva's I-129 petition when he finally filed it in April 2016, the mitigating effect of that payment was diminished by his subsequent inaction and the resulting dismissal of that petition.
{¶ 29} The mitigating effect of Karp's lack of prior discipline and his mental and physical disorders are likewise tempered by their surrounding facts. Although Karp has not been disciplined by this court for prior misconduct, he testified that another client had filed a malpractice claim against him in 2014 for failing to file a memorandum in opposition to a motion for summary judgment. He also stated that that malpractice action contributed as a cause to his depression.
{¶ 30} Gov.Bar R. V(13)(C)(7) provides that a mental disorder may be a mitigating factor when all the following are shown: (1) a diagnosis by a qualified healthcare professional, (2) a determination that the disorder contributed to the cause of the misconduct, (3) a sustained period of successful treatment, and (4) a prognosis from a qualified healthcare professional that the attorney will be able to return to the competent and ethical professional practice of law. Here, it is clear that Karp has been diagnosed with major depressive disorder and an exacerbating physical disorder-hypothyroidism-both of which contributed to his misconduct in this case. A qualified healthcare professional has also offered a prognosis that with continued treatment and monitoring, Karp is capable of practicing law. But it is not entirely clear that Karp has had a sustained period of successful treatment .
{¶ 31} Karp began to take prescribed medication for his depression in March 2017 and started to participate in psychotherapy in June 2017. Dr. Soliman evaluated Karp in September 2017 and reported that Karp had had "a period of sustained treatment with some success. " (Emphasis added.) He also suggested that Karp would see greater improvement with more aggressive treatment-including an increased dosage of his antidepressant and additional medication for his hypothyroidism.
*226 {¶ 32} Karp's treating professionals agreed with Dr. Soliman's proposal, and Karp began the new treatment regimen in late September 2017. Dr. Soliman noted that when he saw Karp in November (just two weeks before his disciplinary hearing), Karp was responding well to treatment, that his condition had "improved markedly," and that his depression was "essentially in remission." But Dr. Soliman also stated that he used the term "remission" cautiously because it had been a little less than two months since Karp last met the diagnostic criteria for major depression. Therefore, it is not entirely clear from the *827 record that Karp has achieved the sustained period of successful treatment necessary for his mental disorder to qualify for maximum mitigating effect under Gov.Bar R. V(13)(C)(7)(c).
{¶ 33} Karp's reliance on Crosser, 147 Ohio St.3d 499, 2016-Ohio-8257, 67 N.E.3d 789, and Fumich, 116 Ohio St.3d 257, 2007-Ohio-6040, 878 N.E.2d 6, and his claims that he made full and free disclosure to the board and demonstrated a cooperative attitude toward the disciplinary process are also problematic. Like Karp, both Crosser and Fumich neglected client legal matters and then lied to the clients to conceal that misconduct. But in addition to mitigating factors, there was only one aggravating factor in Crosser and none in Fumich .
{¶ 34} Here, the board found that five aggravating factors apply. Karp acted with a dishonest motive, committed multiple offenses, engaged in a pattern of misconduct, and caused harm to Gadzheva. Karp also continued to engage in dishonest conduct during the course of relator's disciplinary investigation. And due to the dishonesty that Karp exhibited during the disciplinary investigation, we decline to afford significant mitigating effect to his belated cooperation in the disciplinary proceedings. Moreover, these five aggravating factors distinguish this case from Crosser , Fumich , and other cases in which we have departed from the general rule that a course of dishonest conduct warrants an actual suspension from the practice of law. We therefore overrule Karp's objection and adopt the board's recommended sanction-but without the requirement that Karp serve a two-year period of monitored probation upon his reinstatement to the practice of law.
Disposition
{¶ 35} Accordingly, Harlan Daniel Karp is suspended from the practice of law in Ohio for two years, with 18 months of the suspension stayed on the conditions that he (1) enter into an OLAP contract, comply with all treatment recommendations of OLAP and his treating healthcare professionals, and provide quarterly reports from OLAP and his treating professionals to verify that he is in compliance with all treatment recommendations and (2) engage in no further *227 misconduct. If Karp violates either of these conditions, the stay will be lifted and he will serve the entire two-year suspension. Costs are taxed to Karp.
Judgment accordingly.
O'Connor, C.J., and French and DeWine, JJ., concur.
Fischer and DeGenaro, JJ., concur but would require practice monitoring as a condition of the 18-month stay.
O'Donnell, J., dissents, with an opinion.
Kennedy, J., dissents, with an opinion.
O'Donnell, J., dissenting.
{¶ 36} Respectfully, I dissent.
{¶ 37} In my view, the majority fails to accord sufficient weight to the mitigating factors in this case: Harlan Karp's lack of prior discipline, his payment of restitution; evidence of his good character and reputation, and the hypothyroidism and major depressive disorder that contributed to his misconduct.
{¶ 38} I would adopt the sanction that the parties agreed to in this case: a two-year suspension, fully stayed on the conditions that Karp enter into a contract with the Ohio Lawyers Assistance Program ("OLAP") and remain compliant with the treatment recommendations from OLAP and his treating healthcare professionals and that he provide relator with quarterly *828 reports demonstrating his compliance. And I would further order Karp to serve a two-year period of monitored probation upon reinstatement to the practice of law in accordance with Gov.Bar R. V(21).
{¶ 39} " '[T]he primary purpose of disciplinary sanctions is not to punish the offender, but to protect the public.' " Disciplinary Counsel v. Guinn , 150 Ohio St.3d 92, 2016-Ohio-3351, 79 N.E.3d 512, ¶ 16, quoting Disciplinary Counsel v. O'Neill , 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53. These measures are all that is necessary to achieve that goal.

O-1B visas are for individuals who possess extraordinary ability in the arts or extraordinary achievement in the motion-picture or television industry.

Although the parties stipulated that this allegation would be dismissed, that stipulation was rejected based on clear and convincing evidence that Karp had violated this professional-conduct rule.

The complaint stated this violation in terms of Prof.Cond.R. 8.1(b), but the parenthetical explanation of the violation was stated in terms of Prof.Cond.R. 8.1(a). Because the stipulations, the panel, and the board all cite Prof.Cond.R. 8.1(a), and not Prof.Cond.R. 8.1(b), we conclude that the complaint's reference to Prof.Cond.R. 8.1(b) is a typographical error.